UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| TYRONE MUSE, )  |   | |
|     Plaintiff, ) | | |
| ) | | |
| vs. ) | 1:06-cv-998-SEB-JMS | |
| ) | | |
| UTILI-COMM SOUTH, INC., ) | | |
|     Defendant. ) | | |

**ENTRY GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This cause comes before the Court on the Motion for Summary Judgment [Docket No. 42] filed by Defendant, Utili-Comm South, Inc. ("Utili-Comm"), pursuant to Federal Rule of Civil Procedure 56. Plaintiff, Tyrone Muse ("Muse"), brought this suit against Utili-Comm, his former employer, alleging that it discriminated against him on the basis of his race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and that it retaliated against him for raising his concerns that he was being discriminated against. For the reasons detailed in this entry, we GRANT Utili-Comm's Motion for Summary Judgment and enter final judgment accordingly.[1]

**Factual Background**

Muse, who is African-American, began working at Utili-Comm as a warehouse clerk on December 9, 2004. Am. Compl. ¶¶ 8, 10. On May 30, 2005, he received a raise

---

[1] In addition, we DENY Utili-Comm's Request for Hearing on its summary judgment motion [Docket No. 45]. We are able to reach our decision based upon the briefings submitted by the parties, making oral argument unnecessary.

of thirty-five cents per hour.  Pl.'s Resp. to Def.'s Request for Admissions #1.  On November 14, 2005, Muse was promoted to warehouse supervisor, as a result of which he received a raise of $2.15 per hour.  Id. #2; Ward Aff. ¶ 3.

The circumstances surrounding the termination of Muse's employment are in dispute between the parties.  Utili-Comm asserts that, on February 28, 2006, a customer complained to Utili-Comm South that Muse had smelled of marijuana while performing services at the customer's premises.  Ward Aff. ¶ 9.  On March 2, 2006, two Utili-Comm managers asked Muse to submit to a drug test and informed him that, if he refused to take the test, his employment would be terminated.  Id. ¶ 10.  Muse left Utili-Comm's premises without taking the drug test.  Id. ¶ 11; Pl.'s Resp. to Def.'s Request for Admissions #11.  Mark Ward ("Ward"), Utili-Comm regional manager, testified that Muse returned later that day to Utili-Comm South and turned in his work keys, without having been requested to do so, assuming that his employment had been terminated.  Ward Aff. ¶ 12.

Muse's version of these events differs.  He maintains that, on February 23, 2006, he had a conversation with Ward regarding his compensation – namely, asserting that he had not received raises he "should have" received, though white employees "in supervisor positions similar to [Muse's]" had received such raises.  Am. Compl. ¶¶ 13-16.  Muse claims that during this conversation Ward became upset with him and that Muse's supervisors accused him of using drugs in retaliation for his having requested a raise.  Id. ¶¶ 17-19.  Muse claims that he was not informed who the complaining customer was,

2

though he had asked repeatedly.  Muse Aff. ¶ 5.  Though Muse does not dispute that he left Utili-Comm's premises without taking the drug test, he claims that Office Manager Jeannie Reckard gave him permission to leave and that he had been willing to submit to a drug test.  Am. Compl. ¶¶ 20, 23; Muse Aff. ¶ 9.  Muse does not dispute that his employment was terminated at least in part because he left Utili-Comm's premises.  Am. Compl. ¶ 21.

On June 27, 2006, Muse filed this action against Utili-Comm.  Muse asserts that Utili-Comm discriminated against him on the basis of his race, in violation of Title VII, both by paying him disparate wages and by terminating him after he refused the drug test, and that it retaliated against him by terminating his employment when he raised concerns about his raises.  On April 30, 2007, Utili-Comm filed its Motion for Summary Judgment as to all of Muse's claims, on which we now rule.

## Legal Analysis

**I.    Standard of Review**

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  In deciding whether genuine issues of material

fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. See id. at 255. However, neither the "mere existence of some alleged factual dispute between the parties," id., 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. Michas v. Health Cost Controls of Ill., Inc., 209 F.3d 687, 692 (7th Cir. 2000).

Summary judgment is not a substitute for a trial on the merits nor is it a vehicle for resolving factual disputes. Waldridge v. Am. Hoechst Corp., 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. See Shields Enterprises, Inc. v. First Chicago Corp., 975 F.2d 1290, 1294 (7th Cir. 1992); Wolf v. City of Fitchburg, 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. See Celotex, 477 U.S. at 322; Ziliak v. AstraZeneca LP, 324 F.3d 518, 520 (7th Cir. 2003). A failure to prove one essential element "necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323.

The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. Celotex, 477 U.S. at 325. A plaintiff's

self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment. Albiero v. City of Kankakee, 246 F.3d 927, 933 (7th Cir. 2001); Stagman v. Ryan, 176 F.3d 986, 995 (7th Cir. 1999); Slowiak v. Land O'Lakes, Inc., 987 F.2d 1293, 1295 (7th Cir. 1993).

The summary judgment standard is applied rigorously in employment discrimination cases, because intent and credibility are such critical issues and direct evidence is rarely available. Seener v. Northcentral Technical Coll., 113 F.3d 750, 757 (7th Cir. 1997); Wohl v. Spectrum Mfg., Inc., 94 F.3d 353, 354 (7th Cir. 1996). To that end, we carefully review affidavits and depositions for circumstantial evidence which, if believed, would demonstrate discrimination. However, the Seventh Circuit has also made clear that employment discrimination cases are not governed by a separate set of rules, and thus remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts. Giannopoulos v. Brach & Brock Confections, Inc., 109 F.3d 406, 410 (7th Cir. 1997).

**II.     Muse's Race Discrimination Claims**

Muse's two claims of race discrimination (both his wage disparity claim and his claim that he was terminated because of his race) are to be analyzed under the framework established by the McDonnell Douglas burden-shifting method of proof. A plaintiff may prove a claim of discrimination either by presenting direct evidence of discrimination or

by proceeding under the McDonnell Douglas framework.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  The parties have addressed only the McDonnell Douglas framework in their briefs, so we shall follow their lead and proceed solely with that analysis.

Under McDonnell Douglas, a plaintiff must begin by establishing a *prima facie* case of discrimination.  If one can be established, the burden shifts to the defendant to articulate a nondiscriminatory reason for the actions it took against the plaintiff.  If the defendant can offer a legitimate, nondiscriminatory reason for the employment decision, the burden reverts to the plaintiff to show that there is a genuine dispute of material fact that the proffered reason for the employment action is pretextual.  Nese v. Julian Nordic Constr. Co., 405 F.3d 638, 641 (7th Cir. 2005).

Thus, our initial inquiry is whether Muse has demonstrated a *prima facie* case of race discrimination.  In that regard, he must show: (1) that he was part of a class protected by Title VII; (2) that he was meeting Utili-Comm's legitimate job expectations; (3) that he suffered an adverse employment action; and (4) that similarly-situated individuals outside Muse's protected class were treated more favorably.  See Elkhatib v. Dunkin Donuts, Inc., 493 F.3d 827, 830 (7th Cir. 2007).

The parties do not dispute that Muse has met his burden under the first and second prongs of the McDonnell Douglas framework, to wit, that he is an African-American man

and that he was meeting Utili-Comm's legitimate employment expectations.[2]  Therefore, only the third and fourth prongs of the analysis are at issue here.

### A. *Muse's Wage Discrimination Claim*[3]

Neither the Supreme Court nor the Seventh Circuit has articulated precisely how the standard four-part McDonnell Douglas analysis is to be tailored to wage discrimination claims.  See Adams v. CBS Broadcasting, Inc., 61 Fed. Appx. 285, 288 (7th Cir. 2003).  However, the Seventh Circuit has held that, in order to articulate the fourth prong of a *prima facie* claim, a plaintiff need at least show that similarly situated

---

[2] In support of this assertion, Muse set forth in his affidavit that he had not had any attendance problems nor any disciplinary write-ups during his employment with Utili-Comm (Muse Aff. ¶¶ 1, 2); Utili-Comm has not disputed these contentions or made any representations to the contrary.

[3] Four days after the conclusion of the parties' briefings in this cause, the Supreme Court issued a ruling in Ledbetter v. Goodyear Tire & Rubber Co., 127 S.Ct. 2162 (2007), in which it established that each allegedly discriminatory pay decision constitutes a "discrete act" of discrimination which separately triggers the statutory time limit for the filing of EEOC charges. Under Ledbetter, a plaintiff is time-barred from filing suit under Title VII for any discrete act of wage discrimination about which he or she did not file an EEOC charge within the 300-day deadline.  See Brown v. Illinois Dept. of Natural Resources, 2007 WL 2410062 at *4 (7th Cir. August 27, 2007).

In light of Ledbetter, we express some concern about the timeliness of Muse's wage discrimination claim.  Muse's complaint alleges that he "should have received three raises from May 2005 to February 2006" (Am. Compl. ¶ 13) but does not delineate when these raises should allegedly have been received with any more specificity.  Muse filed his EEOC Charge of Discrimination on March 2, 2006.  Without more detail, we cannot determine whether any part of Muse's wage discrimination claim (specifically, any allegedly discriminatory acts occurring in May 2005) may be time-barred under Ledbetter, and neither of the parties has provided us with any supplemental briefing related to the timeliness of Muse's claim in light of this ruling. However, because Muse's claims fail on their merits, as we discuss herein, we assume without deciding that his wage discrimination claim is timely in the case at bar.

employees outside the protected class were paid more. Id.; Johnson v. Univ. of Wisconsin-Eau Claire, 70 F.3d 469, 478 (7th Cir. 1995).

Muse describes several comparators whom he believes were treated more favorably than he. Muse asserts that Nick Jordan, Kevin Eck, and Brian Walton received higher wages than he and that they are not members of Muse's protected class (African-American). Muse further asserts that certain of his co-workers – namely, Nick Jordan and Jeanine Reckard – received raises within ninety days of their employment at Utili-Comm, while he did not receive a raise until approximately five months after he began employment. Muse Aff. ¶¶ 10-12.

In order for an employee to be similarly situated to a plaintiff for purposes of McDonnell Douglas comparison, a plaintiff "must show that there is someone who is directly comparable to [him or] her in all material respects." Patterson v. Avery Dennison Corp., 281 F.3d 676, 680 (7th Cir. 2002). The comparator must be similar "in terms of performance, qualifications, and conduct. . . . This normally entails a showing that the two employees . . . had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." Radue v. Kimberly-Clark Corp., 219 F.3d 612, 617-18 (7th Cir. 2000). Further, "different employment decisions, concerning different employees, made by different supervisors, are seldom sufficiently comparable to establish a *prima facie* case of discrimination for the simple reason that different supervisors may exercise their discretion differently. . . . These distinctions sufficiently account for any disparity in

treatment, thereby preventing an inference of discrimination." Id. at 618.

None of the four employees cited by Muse can properly be viewed as similarly situated comparators under this standard. Nick Jordan, a white male whom Muse asserts made more money and received raises more promptly than he, was a lead dispatcher who supervised at least four employees at any given time, and whose job duties included scheduling and supervising the dispatch team, assigning logs, and resolving scheduling issues. Ward Aff. ¶¶ 13-15. Brian Walton and Kevin Eck were "technician managers" whose responsibilities were "highly technical" and required previous cable installation experience. Id. ¶¶ 26, 28, 32. Walton and Eck were jointly responsible for supervising approximately ten independent technician subcontractors, assuring quality control, conducting safety inspections on the technicians' work, collecting billings from the technicians, and other duties. Id. ¶ 29. Jeanine Reckard received her raise on the occasion of her promotion from dispatcher to Lead Dispatcher – a job with entirely distinguishable responsibilities (and a different salary) from those in Muse's position. Ward Supp. Aff. ¶¶ 7-8; Def.'s Reply at 6.

Muse supervised no employees until the final ten days of his employment with Utili-Comm; in his position as warehouse supervisor, he was responsible for physically organizing the warehouse, ensuring that the warehouse had accurate inventory and that the technicians signed out the appropriate inventory, and picking up inventory from Utili-Comm's customers to stock the warehouse. In addition, he was responsible for cleaning the office, warehouse, and parking areas. Ward Aff. ¶¶ 4, 5, 7, 8. His position did not

require any technical experience or prior cable installation experience. Id. ¶ 6. Because Muse's employment responsibilities fundamentally differed from those of Jordan, Walton, Eck, and Reckard, Muse has not established that he was treated less favorably than similarly situated employees outside his protected class, and therefore he has failed to meet his *prima facie* burden under McDonnell Douglas as to his wage discrimination claim. Accordingly, summary judgment is GRANTED in Utili-Comm's favor as to this claim.

### B.     *Muse's Discrimination Claim Related to Termination of his Employment*

Muse also contends that Utili-Comm discriminated against him due to his race when it terminated his employment after he refused to submit to a drug test. Muse contends that Utili-Comm treated him less favorably than it treated similarly situated employees in similar situations. Muse describes three such situations. First, he points to an incident in which two technicians, Ray Kinser and Pete Bigalke[4], allegedly were found in possession of marijuana in a hotel room provided by Utili-Comm; Muse asserts that Kinnser and Bigalke were not asked to submit to a drug test and that no corrective action was ever taken against them. Muse Aff. ¶¶ 14, 15. Second, Muse asserts that another technician, Bernie Klooz, was transferred when a residential customer complained that Klooz was smoking marijuana in the customer's driveway, but was not asked to take a

---

[4] Muse refers to "Pete Lagouchy" in his affidavit and response brief; Utili-Comm states that there were no technicians at the company by that name, and that it assumes therefore that Muse is referring to Pete Bigalke. Def.'s Reply at 4 fn. 1.

drug test and was not otherwise punished. Id. ¶¶ 16-20. Third, Muse describes Larry and Troy Boles, two brothers who were Utili-Comm technicians and whom Muse asserts "had drinking problems" and "would often come in smelling like liquor and acting drunk." Id. ¶¶ 21-22. Muse claims that the Boles brothers were sent home on one occasion after coming in drunk, but were not asked to submit to a drug test, and no other action was taken against them. Id. ¶¶ 23-24.

Muse's comparisons to Kinnser, Bigalke, Klooz, and the Boles brothers do not suffice to establish the fourth prong of a *prima facie* claim. To begin with, these five individuals were not Utili-Comm's employees; rather, they were all independent contractor technicians whose relationship with Utili-Comm was governed by an independent contractor agreement. Ward Supp. Aff. ¶ 4-5. Muse, in contrast, was an at-will employee whose employment relationship with Utili-Comm was not regulated by a written contract. Id. ¶ 17. Because McDonnell Douglas requires that the plaintiff's *prima facie* comparison be made to similarly situated *employees*, and because Muse's employment status as an at-will employee differs fundamentally from that of a technician independent contractor, Muse cannot satisfy this prong. See Taylor v. ADS, Inc., 327 F.3d 579, 581 (7th Cir. 2003) (holding similarly when plaintiff's only potential comparator was an independent contractor).[5]

---

[5] In addition, Muse argues that he was similarly situated to the technicians because he worked closely with them, delivered necessary equipment to them, and would occasionally ride with them if they were short-staffed. Muse Aff. ¶ 27. Even if Muse and the technicians did have a close working relationship and assisted one another on occasion, it is clear that Muse's job
(continued...)

Muse's claim is also deficient because his assertions are supported solely by his own affidavit. Nowhere in his affidavit does Muse demonstrate personal knowledge of the events he represents to have occurred with respect to the technicians' behavior, as is required by Federal Rule of Procedure 56(e). Utili-Comm also validly objects that Muse's assertions are based on hearsay and are therefore inadmissible. As we have explained, a plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary judgment. Albiero v. City of Kankakee, 246 F.3d 927, 933 (7th Cir. 2001); see also Watson v. Lithonia Lighting, 304 F.3d 749, 751 (7th Cir. 2002) ("The difficulty with this submission is that [the plaintiff] does not explain how she learned this or offer evidence from anyone with personal knowledge[.] . . . [Her] affidavit was not based on personal knowledge and did not imply the availability of any admissible evidence."). For this additional reason, Utili-Comm's motion must be GRANTED as to this claim also.

### III.    Muse's Retaliation Claim

Muse also contends that the termination of his employment constituted retaliation for voicing his concerns that he was had not received raises due to his race. To make out a *prima facie* retaliation claim under the McDonnell Douglas indirect method of proof, a plaintiff must show that (1) he engaged in statutorily protected activity; (2) he met the

---

[5](...continued)
responsibilities differed significantly from those of the technicians.

employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than similarly situated employees who did not engage in statutorily protected activity.  Graham v. AT&T Mobility, LLC, 2007 WL 2565999, at *3 (7th Cir. Sept. 6, 2007).

It is well established that "[f]ailure to satisfy any one element of the prima facie case is fatal to an employee's retaliation claim."  Id., quoting Sublett v. John Wiley & Sons, Inc., 463 F.3d 731, 740 (7th Cir. 2006).  With regard to the fourth prong, Muse has introduced no additional evidence or argument beyond that referenced above as to similarly situated employees treated more favorably.  Because, as we have previously described, Muse has not met his burden on this prong, his retaliation claim similarly fails.  Therefore, summary judgment is GRANTED in Utili-Comm's favor as to Muse's retaliation claim as well.

## IV.     Conclusion

For the reasons discussed herein, we GRANT Utili-Comm's Motion for Summary Judgment as to all claims, and enter final judgment accordingly.  IT IS SO ORDERED.

Date: _____10/17/2007_____

_____
SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Copies to:

Geoffrey Mitchell Grodner
MALLOR CLENDENING GRODNER & BOHRER
gmgrodne@mcgb.com

Adam Lenkowsky
ROBERTS & BISHOP
alenkowsky@roberts-bishop.com

Janice L. Sterling
MALLOR CLENDENING GRODNER & BOHRER LLP
jsterling@mcgb.com